# Illinois Official Reports

## Appellate Court

---

### *People v. Bowen*, 2015 IL App (1st) 132046

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HARVEY BOWEN, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-2046 |
| Filed | July 31, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-5522; the Hon. Angela M. Petrone, Judge, presiding. |
| Judgment | Affirmed; fines and fees ordered corrected. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Alison L.S. Shah, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Tasha-Marie Kelly, Assistant State's Attorneys, and Brian A. Levitsky, Special Assistant State's Attorney, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Palmer and Justice Gordon concurred in the judgment and opinion. |

# OPINION

¶ 1     Defendant, Harvey Bowen, was charged with possession of contraband in a penal institution (720 ILCS 5/31A-1.1(b) (West 2010)). The indictment specifically alleged that he possessed a "dangerous weapon, to wit, a sharp metal object" while in the Cook County jail on March 6, 2011. After a bench trial, defendant was found guilty of that offense, and was sentenced to six years' imprisonment. He now appeals that judgment.

¶ 2     At trial, the State presented the testimony of Pedro Ramirez, a correctional officer in the Cook County sheriff's department. Officer Ramirez testified that on the morning of March 6, 2011, he was assigned to do a "shakedown" of a "couple different tiers" in the Cook County jail. The officer described the procedure for a "shakedown" as, "[w]e go in, we bring the detainees out of their living unit, secure them, pat them down and check their living unit" for contraband. When Officer Ramirez approached defendant's cell, he observed defendant sitting on the bottom bunk and his cellmate sleeping on the top bunk. He then brought the inmates out of the cell, "secured them in cuffs," patted them down, and proceeded inside to begin the search.

¶ 3     At the foot of the bottom bunk bed, he discovered a stack of Styrofoam trays which were tied together with pieces of bed sheet. He testified that the inmates were not allowed to have these trays in their cells because they could be melted down and turned into weapons. The officer untied the bed sheets, and hidden inside the stack of trays, he discovered a 7½-inch long "large metallic piece shaped like a knife, or what we commonly refer to as a shank, with a handle made out of a piece of sheet." He identified a photograph of the shank, and testified that he could "tell [the shank] had been sharpened."

¶ 4     The officer exited the cell, showed defendant and his cellmate the shank, and asked them "what is this for, who does it belong to[?]" After defendant's cellmate did not say anything, Officer Ramirez told them "either way you are both in the cell, you can both get charged, what's the deal with this thing[?]" Defendant then responded that it was his. The officer asked defendant "what [he] would *** be doing with" the shank, and defendant said "something to the effect [of] he needed it to protect himself." Officer Ramirez testified that this conversation took a minute or less.

¶ 5     The officer did not know how defendant and his cellmate "arranged matters" in the cell, but based on his prior experience, he knew that the inmate who had the bottom bunk would generally store his belongings underneath that bunk. He believed that defendant had the bottom bunk because he found him sitting there when he approached the cell, and he also observed that the stack of trays was with some of defendant's personal belongings.

¶ 6     Defendant testified that on March 6, 2011, he had the top bunk in his cell, and was asleep on that bunk when Officer Ramirez walked in. The officer took him and his cellmate outside, searched the cell, and let them back inside. Officer Ramirez never said anything to him or his cellmate, or showed them a shank. Defendant stated that there was a stack of trays inside the cell, which he knew were contraband, but that "everyone uses them as a makeshift chair to sit in the chuck and watch television." He denied the stack of trays were his, and testified that they were by the door, not by the bed. He had never seen the shank before, and did not put it inside the stack of trays.

¶ 7    The State then entered a certified copy of defendant's conviction for aggravated battery with a firearm and, after argument, the court found defendant guilty of possession of contraband in a penal institution concluding that Officer Ramirez's testimony was credible, and the testimony of defendant was incredible. The court specifically observed that it disbelieved defendant's testimony regarding the location of the stack of trays, because he would be unlikely to leave contraband by the cell door where it could be seen by prison officials.

¶ 8    Thereafter, defendant moved for a new trial, asserting that he had discovered additional witnesses who would contradict Officer Ramirez's testimony. The court granted defendant's motion and allowed him a continuance to reopen the case and call those witnesses.

¶ 9    When the trial continued, defendant called Albert Robinson, who testified that he is a convicted felon and that he was assigned to the cell next to defendant's at the time of the search. During the search, he and the other inmates were lined up outside the cells, about 15 feet from the cell doors. He stood near defendant at that time, but he did not see or hear any officer speak with defendant or show him a shank.

¶ 10   Marcelino Ruiz testified that he is a convicted felon and he was defendant's cellmate on March 6, 2011. Ruiz testified that he used the bottom bunk and defendant used the top. Ruiz was asleep on the bottom bunk at the time Officer Ramirez came in to do the search. The officer woke him up and told him and defendant to step outside, then brought them to the "day room" where they sat while the search was conducted. After the search was complete, they were told to go back to their cell. At no time did Officer Ramirez talk to him or defendant about a shank, and he never observed the officer holding a shank, or speaking to anyone that morning. Ruiz testified that there was a stack of Styrofoam containers by the cell door, but denied that they were his.

¶ 11   The defense rested and after argument the court again found defendant guilty of the charged offense. The court incorporated its prior ruling and reiterated its finding that Officer Ramirez's testimony was credible. It also found Robinson and Ruiz incredible, noting that they were impeached by their prior felony convictions, and that they testified inconsistently with each other, and with defendant, specifically regarding where they were when the search took place.

¶ 12   Thereafter, defendant filed a posttrial motion to reconsider or for a new trial, and during a hearing on that motion, defendant claimed *pro se* that his trial counsel had been ineffective. The trial court allowed defendant to explain his arguments, indicating that it wanted to take "what [he] said very seriously about ineffective assistance of counsel." Defendant specifically complained that counsel had failed to file a motion to suppress his statements where he had not been advised of his *Miranda* rights and had failed to call Officer Ramirez to question him regarding the lack of *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436 (1966). Defendant also maintained that his counsel was ineffective for failing to ask the court to recuse itself after the initial guilty finding. The court granted defendant a continuance to determine whether there were any other claims he wished to bring to its attention.

¶ 13   At a subsequent hearing, the court again allowed defendant to explain his claims. Defendant stated that he had asked his counsel to file a motion to suppress statements on the grounds that he had not been informed of his *Miranda* rights, and that his statements would have been suppressed if counsel had "called forth a *Miranda* hearing."

¶ 14　　　The court gave counsel the opportunity to respond and counsel stated that Officer Ramirez's report did not indicate whether *Miranda* warnings were given or whether there had been a change in custodial status when defendant made the statements. He asserted, "I think it would have been prudent to have filed a motion to suppress that statement based on the absence of Miranda. I did not file it. *** [I]t was not a matter of trial strategy to not file that, the better practice would have been to file it beforehand." Counsel then said that the trial testimony "clearly [showed] a chain [*sic*] in custodial status" and that he should have raised the *Miranda* issue, once that became clear. Counsel again stated that his failure to do so was not a matter of trial strategy.

¶ 15　　　In ruling on defendant's *pro se* claims, the trial court stated:

> "Now, regarding Miranda not being given. I'm not aware of any law that requires that Miranda be given in custodial settings when an officer immediately finds a weapon (inaudible). I'm not aware that Miranda was required.
>
> I think that your attorney in a way took some responsibility (inaudible) and not file the motions. And I'm going to say he didn't need to take that responsibility. Your attorney did a find [*sic*] job of representing you.
>
> But even if there is [*sic*] some errors that there should have been a motion filed. I did not find him guilty not only because of his statement. But it's because of certain actual evidence and the constructive possession of you and that shank.
>
> You were the person who was sitting on the bed–excuse me–in the cell *** that had Styrofoam trays with a shank in between it. ***
>
> And the cell[mate] was on the top bunk. I find you to be in constructive possession of that shank. And the circumstantial evidence tells me that it's your's [*sic*] even in part from the statements.
>
> So for all of those reasons, I will say that [counsel] was not ineffective. *** [H]e went above and beyond for you. Getting the jail records, filing detailed motions, asking to reopen the case, asking to reconsider. ***
>
> I find that your attorney was not ineffective."

¶ 16　　　Thereafter, the court denied defendant's motion for a new trial and proceeded to sentencing. In aggravation, the State emphasized defendant's criminal history and the fact that he had continued to break the law while he was in jail. The State also argued that the seriousness of the crime necessitated a significant sentence and requested the maximum of 15 years' imprisonment. Defense counsel contended that the minimum sentence of four years' imprisonment was appropriate, highlighting that the shank had been found during a random search and that there was no evidence that anyone had been immediately threatened with it. Counsel further argued that defendant was a young man who had a good relationship with his family and that he could be "restored to productive citizenship."

¶ 17　　　After considering presentence investigation report, the court noted that defendant "had a pretty good childhood" and that he had been previously employed. It remarked:

> "THE COURT: So I am taking into consideration the mitigation presented here that you are employable. You can work. Says you are not affiliated with the gangs and have a good family support system.

And I'm looking at your criminal record. It does show that now you are doing a sentence of 12 years on–you were charged with murder, but it looks like the conviction was for armed robbery; am I reading it correctly?

ASSISTANT STATE'S ATTORNEY: The conviction was actually for aggravated battery with a firearm.

THE COURT: All right. *** Thank you. Another conviction for unlawful use of a weapon in[ ] 05. I'm not considering any of the arrests that were not finding of guilty.

And the seven-inch sharpened shank in the cell, I find it to be aggravating. You were waiting [*sic*] trial on a murder charge when you were found with the shank even though you weren't convicted of that charge, you were waiting trial for that charge when you were found with a shank. And that's somewhat aggravating.

I will also consider your counsel's argument that it wasn't allegedly used in any way or threatened anyone with it. And did find that to be in your favor. So there's some good here and some bad here.

I do not believe the 15 years requested by the State would be appropriate in this matter. I do believe a sentence here is necessary to deter others from–(inaudible).

Because you were waiting trial for murder case when this happened, I don't find that the minimum would be appropriate either. I'm sentencing you to six years in the Illinois Department of Corrections consecutive to [defendant's aggravated battery with a firearm conviction]."

¶ 18    Defendant's motion to reconsider was denied and defendant filed a notice of appeal from that ruling.

¶ 19    In this court, defendant contends that he was denied the effective assistance of counsel where counsel failed to file a motion to suppress his statements based on the absence of *Miranda* warnings. He additionally asserts that he demonstrated counsel's "possible neglect" of his case based on the failure to do so and that, accordingly, the appointment of new counsel was required. Defendant further contends that he was denied a fair sentencing hearing because the court considered conduct that was inherent in the offense and a prior offense for which he had been acquitted in fashioning his sentence. He also complains that certain fines and fees must be vacated or offset by presentence custody credit and, in a supplemental brief, he argues that the evidence was insufficient to sustain his conviction. Because the sufficiency issue could be dispositive of the remainder of this appeal, we choose to address it first.

¶ 20    When reviewing a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses (*People v. Young*, 128 Ill. 2d 1, 51 (1989)) and will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of a defendant's guilt (*Collins*, 106 Ill. 2d at 261).

¶ 21    To establish defendant's guilt of possession of contraband in a penal institution in violation of section 31A-1.1(b) of the Criminal Code of 1961 (Code), the State was required

to prove that he knowingly possessed contraband in a penal institution, regardless of the intent with which he possessed it. 720 ILCS 5/31A-1.1(b) (West 2010). Defendant does not challenge the sufficiency of the evidence to show his knowing possession of the shank, but argues only that the evidence did not support a finding that it qualified as an item of contraband under the statute. We disagree.

¶ 22    Section 31A-1.1(c)(2)(v) of the Code defines an " '[i]tem of contraband' " as including a " '[w]eapon,' " meaning any of the following:

> "any knife, dagger, dirk, billy, razor, stiletto, broken bottle, or other piece of glass which could be used as a dangerous weapon. Such term includes any of the devices or implements designated in subsections (a)(1), (a)(3) and (a)(6) of Section 24-1 of this Act, or any other dangerous weapon or instrument of like character." 720 ILCS 5/31A-1.1(c)(2)(v) (West 2010).

¶ 23    In this case, Officer Ramirez described the item found in defendant's cell as a "shank," which is generally understood to refer to a type of knife–specifically, one that is homemade. Black's Law Dictionary defines a "shank" as a "pointed or sharp-edged weapon, usu. a dagger or knife, that is usu. either homemade or made by a prisoner." Black's Law Dictionary (10th ed. 2014). Similarly, Merriam-Webster defines "shank" as a slang term for "an often homemade knife." Merriam-Webster's Collegiate Dictionary 1076 (10th ed. 1997). Our supreme court has also recognized that a shank is a type of weapon, or specifically, a "homemade knife." See *People v. Baez*, 241 Ill. 2d 44, 72 (2011) ("[a]fter the incident, officers found a homemade knife made of sharpened metal, called a 'shank,' in the recreation area"); *People v. Lucas*, 151 Ill. 2d 461, 469 (1992) ("[a] 'shank,' or homemade knife, was recovered from the office and identified as the weapon"). Based on the abovementioned definitions, we would conclude that a "shank" would generally fit within the statutory definition of contraband proscribed by the statute, which includes "*any* knife." (Emphasis added.) 720 ILCS 5/31A-1.1(c)(2)(v) (West 2010).

¶ 24    Moreover, beyond the officer's characterization of the item as a "shank," he also described the item and that description lends further support to the court's finding that it was an item of contraband proscribed by the statute. Officer Ramirez testified that the item he discovered was a 7½-inch long "large metallic piece shaped like a knife, or what we commonly refer to as a shank, with a handle made out of a piece of sheet." He could "tell [the shank] had been sharpened" and identified a photograph of it. When the officer asked defendant why he would have the shank, defendant said "something to the effect [of] he needed it to protect himself." The officer's characterization of the item as a "shank," his description of it, and defendant's own statement indicating that the item was intended to be used to "protect himself," were more than sufficient to prove that it qualified as contraband beyond a reasonable doubt. See *People v. Da Collo*, 294 Ill. App. 3d 893 (1998) (evidence was sufficient to establish that a sharpened clip was a "weapon" coming within definition of contraband).

¶ 25    Defendant, however, contends that Officer Ramirez's characterization of the shank was insufficient because "he never described in what manner it was sharpened[, or testified] to the item's weight or heft, or whether it was hardened and stiff or soft and pliable." Defendant however provides no authority, and we are aware of none, which would require such specificity.

¶ 26    Finally, defendant points to the photograph of the item and contends that "[t]he tip of the object therein appears blunt and rounded[, a]nd it is impossible to tell whether any of the sides were sharp." We note that defendant does not contend that the photograph affirmatively contradicts the officer's testimony by showing that the shank was not sharp, but instead, he maintains that the photograph is unclear as to whether it was sharp. This argument, however, ignores Officer Ramirez's explicit testimony that he could tell that the shank had been sharpened. The State was not required to introduce a photograph of the item to sustain its burden (see *People v. Holloway*, 225 Ill. App. 3d 47, 51 (1991)), and given the officer's positive and unambiguous testimony about the nature of the object, we find no reasonable doubt of defendant's guilt arising from the photograph. Viewed in the light most favorable to the State, the evidence was sufficient to sustain defendant's conviction for possession of contraband in a penal institution.

¶ 27    Defendant next argues that he was denied the effective assistance of counsel where counsel failed to file a motion to suppress his inculpatory statements based on the absence of *Miranda* warnings. Ineffective assistance of counsel claims are evaluated under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish that defendant's trial counsel provided ineffective assistance, he must show that counsel's performance was so deficient that his representation fell below an objective standard of reasonableness and that absent this deficient performance, there was a reasonable probability that the outcome of the proceeding would have been different. *People v. Palmer*, 162 Ill. 2d 465, 475 (1994). A defendant's failure to make the requisite showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim. *Id.*

¶ 28    Specifically, when a defendant alleges that counsel failed to file a motion to suppress, he must show, "first, a reasonable probability that the motion would have been granted and, second, that the outcome of the trial would have been different if the motion had been granted." *People v. Little*, 322 Ill. App. 3d 607, 611 (2001). Counsel is not required to make futile motions in order to provide effective assistance. *People v. Wilson*, 164 Ill. 2d 436, 454 (1994). We thus address the merits of defendant's underlying claim–that he was subjected to a custodial interrogation without *Miranda* warnings and that his subsequent inculpatory statements should have been suppressed–to determine whether such a claim had a reasonable likelihood of success.

¶ 29    In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court found that the fifth amendment requires that a suspect be advised of certain rights, including the right to remain silent and the right to an attorney, before he is subject to a custodial interrogation. *Id.* at 444. However, in the absence of both custody and interrogation, an individual's privilege against self-incrimination is not threatened, and *Miranda* warnings are not required. *Illinois v. Perkins*, 496 U.S. 292, 297 (1990) ("[i]t is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation").

¶ 30    Pursuant to *Miranda*, custodial interrogation entails "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Specifically, the word "custody" is a "term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. ___, ___, 132 S. Ct. 1181, 1189 (2012). The initial step in determining whether someone is in custody "is to ascertain whether, in light of 'the objective circumstances of the interrogation,' [citation], a

'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.' [Citation.]" *Id.*

¶ 31 In the years since *Miranda*, courts have wrestled with the question of how it applies when the suspect being questioned is an inmate in a penal institution, who could be considered, by definition, "in custody" at all times. Courts have repeatedly rejected the proposition that any interrogation during prison confinement constitutes custodial interrogation for *Miranda* purposes, because doing so would "create a per se rule" that "could totally disrupt prison administration," and would torture *Miranda* "to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978).

¶ 32 In *Howes*, the United States Supreme Court addressed this issue and determined that "service of a prison term, without more, is not enough to constitute *Miranda* custody." *Howes*, 565 U.S. at ___, 132 S. Ct. at 1184. The Court held that there was no categorical rule regarding whether questioning of a prisoner was custodial and, instead, courts must examine all of the circumstances surrounding the interrogation to determine how a suspect would have gauged his freedom of movement. *Id.* at ___, 132 S. Ct. at 1184 (citing *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994)). The Court made clear, however, that "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*," and courts must ask the "additional question [of] whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at ___, 132 S. Ct. at 1189-90.

¶ 33 When a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation including the language that is used in summoning the prisoner to the interview, and the manner in which the interview is conducted. *Id.* at ___, 132 S. Ct. at 1189. Thus, an inmate is in custody for purposes of *Miranda* only if the totality of circumstances would lead a reasonable inmate in his place to believe that the setting of the interrogation adds new constraints to his freedom. See *id.* at ___, 132 S. Ct. at 1189. Our supreme court has similarly held that to find a defendant was in *Miranda* custody, the court must determine whether his "liberty [was] limited beyond the usual conditions of his confinement." *People v. Patterson*, 146 Ill. 2d 445, 453 (1992).

¶ 34 Applying these principles and considering all of the circumstances surrounding defendant's questioning in this case, we find no reasonable probability that a motion to suppress would have been successful, because defendant was not in custody at the time he was questioned about the shank and, thus, *Miranda* warnings were not required. The evidence elicited at trial showed that defendant and his cellmate were brought out of their cell, patted down, and secured with handcuffs, as part of a routine search of their cell. Immediately after the discovery of the shank in defendant's cell, Officer Ramirez engaged in a very brief, minute-or-less, conversation with defendant and his cellmate on the scene about what the item was and to whom it belonged. Given the circumstances of this case, we find nothing to show how the brief questioning by Officer Ramirez at the scene presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. *Howes*, 565 U.S. at ___, 132 S. Ct. at 1189-90.

¶ 35 We are also instructed by the well recognized principle that *Miranda* is not triggered, and the admonishments are not required, when police conduct general investigatory on the scene questioning as to the facts surrounding a crime or other general questioning. *People v.*

*Hannah*, 2013 IL App (1st) 111660, ¶ 42 (citing *People v. Parks*, 48 Ill. 2d 232, 237 (1971), *People v. Peterson*, 372 Ill. App. 3d 1010, 1018 (2007), and *People v. Kilfoy*, 122 Ill. App. 3d 276, 288 (1984)). In such situations the "compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." *Miranda*, 384 U.S. at 478; see *People v. Havlin*, 409 Ill. App. 3d 427, 435 (2011) (finding that the defendant was not in custody and *Miranda* warnings were not required when the officer asked a general question regarding the ownership of contraband which had been found in a motor vehicle).

¶ 36    Courts have recognized that this type of on the scene questioning may take place in a prison environment as well as in public. See *Cervantes*, 589 F.2d at 429. In *Cervantes*, the Ninth Circuit Court determined that *Miranda* warnings were not required in circumstances where marijuana was uncovered during the course of a routine search, and the questioning of the inmate defendant took place in the prison library and appeared to have been a spontaneous reaction to the discovery. *Id*. The court concluded that this was not an instance of custodial interrogation, and "neither the prison setting nor the presence of [the sheriff's deputies] exerted a pressure to detain sufficient to have caused a reasonable person to believe his freedom of movement had been further diminished. Rather, this was an instance of on-the-scene questioning enabling [the deputy] to determine whether a crime was in progress." *Id.*; see also *State v. Goss*, 995 S.W.2d 617 (Tenn. Crim. App. 1998) (*Miranda* warnings were not required when a correctional officer's on the scene investigatory questioning of the defendant occurred upon entering the scene of an inmate stabbing, and where the officer had not yet restricted the defendant's manner of movement); *People v. Douglas*, 12 A.D.3d 1174, 1174 (N.Y. App. Div. 2004) (holding that a brief investigatory detention of the defendant, following the discovery of a weapon in his shoe, did not "entail added constraint that would lead a prison inmate reasonably to believe that there has been a restriction on that person's freedom over and above that of ordinary confinement in a correctional facility" (internal quotation marks omitted)).

¶ 37    Similarly, in *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985), *cert. denied*, 479 U.S. 830 (1986), the Fourth Circuit rejected the inmate defendant's claim that he was entitled to *Miranda* warnings, concluding that he was not in custody for *Miranda* purposes. The court stated:

> "Although Conley wore handcuffs and, at some points, full restraints, evidence in the record indicates that this was standard procedure for transferring inmates to the infirmary or elsewhere in this maximum security facility. ***
>
> Under the circumstances, Conley's freedom of movement cannot be characterized as more restricted than that of other prisoners in transit to and from the facility, either by virtue of his confinement or the nature of the questioning by prison personnel. Accordingly, *Miranda* warnings were not required and Conley's statements were properly admitted at trial." *Id.* at 973-74.

¶ 38    Although defendant in this case claims he was in custody by pointing to the evidence showing that he was brought outside of his cell and handcuffed, the record is similarly clear that this was standard procedure and was merely incidental to the routine search. He was not removed from his cell or handcuffed as a result of finding the shank, or in order to question him about it, and instead, the procedure occurred before the shank was ever found. We thus conclude that the fact that defendant was brought out of his cell and handcuffed did not place

any greater burden on his freedom than "the usual conditions of his confinement." See *id.* at 973.

¶ 39      Although it is not binding authority on this court, we find this case similar to *Blain v. Commonwealth*, 371 S.E.2d 838 (Va. Ct. App. 1988). In that case, the Virginia Court of Appeals determined that the defendant inmate, who was standing between correctional officers outside his cell during a search of his cell for evidence of the murder of another inmate, was not subject to an added imposition on the freedom of movement and was not in "custody" for *Miranda* purposes. *Id.* at 840-41. The court in that case observed that the inmate was not removed from the cell for the purpose of questioning, and that the search was made pursuant to standard prison procedures applicable to all such searches of the entire prison population. *Id.* at 841; see also *State v. Brown*, 18 S.W.3d 482 (Mo. Ct. App. 2000) (a prison inmate was not in custody for *Miranda* purposes during an interview following the discovery of a homemade knife in the cell he shared with another, where there was no evidence that coercive language was used to set up or start the interview, that coercive questions were asked, that he was removed from his cell, that he was confronted with evidence of his guilt, that any additional pressure was put on him, or that an additional restriction was placed on his freedom of movement).

¶ 40      Defendant relies almost exclusively on *Howes*, 565 U.S. ___, 132 S. Ct. 1181, to support his claim that a motion to suppress his statements based on a *Miranda* violation would have been meritorious, but we determine that *Howes* is distinguishable from the case at bar and dictates the opposite conclusion.

¶ 41      In *Howes*, the Supreme Court considered the interview of the respondent inmate by two sheriff's deputies about criminal activity he had allegedly engaged in before coming to prison. The defendant was summoned from his cell to the interview, which occurred in a conference room and lasted five to seven hours, continuing long after the time when he usually went to bed. *Id.* at ___, 132 S. Ct. at 1193. The officers were armed and one used a " 'very sharp tone,' " but the respondent was not physically restrained or threatened. *Id.* at ___, 132 S. Ct. at 1193. The court observed that the defendant was not uncomfortable, he was given food and water, and he was told he was free to end the questioning and return to his cell. *Id.* at ___, 132 S. Ct. at 1193. After considering these circumstances, the Supreme Court determined that he was not in custody for purposes of *Miranda*, finding that a reasonable person in such an interrogation environment would have felt free to terminate the questioning. *Id.* at ___, 132 S. Ct. at 1193.

¶ 42      Unlike in *Howes*, the questioning of defendant in this case occurred immediately in response to the discovery of contraband in his cell–it did not relate to criminal activity which occurred outside of the penal institution. As we have noted, defendant also was not summoned from his cell, or brought to a different location for purposes of questioning him. Further, the questioning was also of an extremely short duration, as Officer Ramirez testified that the entire conversation took one minute or less. Although there is no indication that defendant was told that he was free to leave during that brief questioning, we do not find this factor critical given the absence of the other coercive features of the interrogation in *Howes*. We conclude that the circumstances of defendant's interrogation do not support the inherently coercive nature associated with custodial interrogations, which would have required Officer Ramirez to give defendant *Miranda* warnings. *Id.* at ___, 132 S. Ct. at

1189-90. Accordingly, any motion to suppress his statements based on the lack of *Miranda* warnings would have been meritless.

¶ 43 Finally, even if defendant had succeeded on the proposed motion, we find no reasonable probability that the outcome of the trial would have been different absent his statements. *Little*, 322 Ill. App. 3d at 611. The court addressed this very issue when it responded to defendant's ineffective assistance claims, indicating that it had found him guilty of possession of contraband based on the circumstantial evidence of his constructive possession, not based on his inculpatory statement. Specifically, Officer Ramirez, whose testimony the court explicitly found credible, testified that defendant was sitting on the bottom bunk when he approached the cell, and that he knew from prior experience that the inmate on the bottom bunk generally stored his items underneath that bunk. The stack of trays containing the shank were found at the foot of the bottom bunk, near where defendant was sitting, and was found with some of defendant's personal items. Given the evidence of defendant's constructive possession of the shank, we would find no prejudice from defense counsel's allegedly deficient performance.

¶ 44 We similarly reject defendant's next argument–that he demonstrated "possible neglect" of his case by defense counsel based on the failure to file a motion to suppress, such that the appointment of new counsel is required under *People v. Krankel*, 102 Ill. 2d 181 (1984). Defendant maintains that counsel's statement that "it would have been prudent" to have filed a motion to suppress, and that his failure to do so "was not a matter of trial strategy," indicates counsel's possible neglect of the case, and accordingly, new counsel should have been appointed to evaluate the claim. We disagree.

¶ 45 Under *Krankel*, when a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court must conduct an adequate inquiry into the factual basis of his claim. *Id.* at 189; see also *People v. Moore*, 207 Ill. 2d 68, 77 (2003). If the court determines the allegations show possible neglect of the case, it should appoint new counsel to represent the defendant at a hearing on the defendant's ineffectiveness claim. *Id.* at 78. However, if the court concludes that the claim lacks merit or pertains solely to matters of trial strategy, the court may deny the *pro se* motion. *Id.*

¶ 46 In this case, defendant raised a *pro se* claim of ineffective assistance of counsel after trial. The court indicated that it wanted to take his claims "very seriously," inquired about the allegations, and allowed defendant a continuance to investigate. At a subsequent hearing, the court gave defendant an additional opportunity to explain his claims and allowed counsel to respond. The court then concluded that counsel was not ineffective, indicating that it did not believe that *Miranda* rights were required under the circumstances of defendant's case, and that counsel had gone "above and beyond" in his representation of him.

¶ 47 As we have previously held that a motion to suppress defendant's statements based on *Miranda* would have been meritless, defendant cannot establish "possible neglect" of his case based on his counsel's failure to file that motion. The court was thus entitled to deny defendant's *pro se* motion without appointing new counsel. *Id.*

¶ 48 Defendant next asserts that he was denied a fair sentencing hearing because the court improperly relied on conduct that was inherent in the offense, and a prior offense for which he had been acquitted, in sentencing him.

¶ 49 Although the imposition of sentence is generally a matter of judicial discretion (*People v. Perruquet*, 68 Ill. 2d 149, 154 (1977)), "the question of whether a court relied on an improper

- 11 -

factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*" (*People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8). It is the defendant's burden to affirmatively establish that the sentence was based on improper considerations (*People v. Conley*, 118 Ill. App. 3d 122, 133 (1983)), and we will not reverse a sentence imposed by a trial court unless it is clearly evident the sentence was improperly imposed (*People v. Ward*, 113 Ill. 2d 516, 526 (1986)).

¶ 50     We consider the record as a whole when determining whether the trial court improperly imposed a sentence, and will not focus on isolated statements. *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30.While the trial court may not consider a factor implicit in the offense as an aggravating factor in sentencing (*People v. Ellis*, 401 Ill. App. 3d 727 (2010)), it may consider the nature and circumstances of the offense, including the nature and extent of each element of the offense committed by the defendant (*People v. Saldivar*, 113 Ill. 2d 256, 268-69 (1986); *People v. Gramo*, 251 Ill. App. 3d 958, 971 (1993)). The trial court is not required to refrain from any mention of the factors which constitute elements of an offense, and a mere reference to the existence of such a factor is not reversible error. *People v. Jones*, 299 Ill. App. 3d 739 (1998).

¶ 51     In arguing that the trial court relied on a factor inherent in the offense, defendant specifically points to the court's statement finding "the seven-inch sharpened shank in the cell, *** to be aggravating." He argues that the court's consideration of the shank was improper as his possession of the shank is implicit in the offense of possession of a weapon in a penal institution.

¶ 52     When viewed in context, it is clear that the trial court was not considering the mere fact that defendant possessed contraband, but was using descriptive language to illustrate the type of weapon and the location of its discovery. As such, the court was merely commenting on the nature and circumstances of the offense, *i.e.*, that the weapon defendant possessed was a relatively large shank and that it was found hidden in his jail cell. These are proper sentencing considerations (*Saldivar*, 113 Ill. 2d at 268-69), and we do not believe the trial court's statement was error.

¶ 53     Defendant also points to the court's comments finding it "somewhat aggravating" that defendant was awaiting trial for murder at the time he was found in possession of the shank and argues that this comment shows that the court considered an offense for which he was acquitted.

¶ 54     Initially, we note that defendant failed to preserve this issue for appeal, and therefore, it is forfeited and cannot be considered unless it amounted to plain error. Ill. S. Ct. R. 615(a). The plain error doctrine allows a reviewing court to consider unpreserved error when: (1) the evidence is close, regardless of the seriousness of the error; or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167 (2005). Specifically, in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) (citing *People v. Hall*, 195 Ill. 2d 1, 18 (2000)). However, before we can determine whether an error fits under either of the above categories, we must first determine whether an error actually occurred. *People v. Cosby*, 231 Ill. 2d 262 (2008).

¶ 55     Although bare arrests and pending charges may not be used to aggravate a sentence, the mere fact that a trial court has knowledge of other arrests before imposing sentence does not

amount to reversible error, because the trial court is presumed to have recognized and disregarded incompetent evidence unless the record reveals the contrary. *People v. Shumate*, 94 Ill. App. 3d 478, 488 (1981). Accordingly, "the record must affirmatively disclose that the arrest or charge was considered by the trial court in imposing sentence." *People v. Garza*, 125 Ill. App. 3d 182, 186 (1984).

¶ 56    Defendant relies on *Shumate*, 94 Ill. App. 3d at 488, to argue that "the fact that [defendant] was charged with murder was something the court was not permitted to take into consideration [in sentencing]." We conclude, however, that *Shumate* does not support defendant's claim, and in fact illustrates why this issue must be resolved against defendant.

¶ 57    The defendant in *Shumate* challenged the trial court's comments at sentencing that although defendant's prior conviction was for aggravated battery, he had been " 'charged with rape and deviate sexual assault in the aggravated battery.' " *Id*. The defendant contended that this comment showed that the court had improperly relied on the prior charges against him, rather than his prior conviction, in fashioning his sentence. While this court reaffirmed the general principle that prior arrests or charges that do not result in conviction may not be considered in sentencing, it found no indication that the trial judge had improperly relied on the prior charges, and affirmed defendant's convictions. *Id*. at 488-89.

¶ 58    Similarly, in this case, we find no indication that the court improperly relied on defendant's prior charges and, in fact, the court specifically indicated that it was not considering any of defendant's arrests of which he had been acquitted. Viewing the court's comments as a whole, it is clear that the court was aware that defendant had been charged with murder, but that he had been acquitted of that offense and convicted of the lesser offense of aggravated battery with a firearm. We find no reason to stray from the presumption that the court recognized and disregarded the incompetent evidence, and find no error in the court's comments. *Id*. at 488. Because we find no error, there can be no plain error to excuse defendant's forfeiture of this issue. *People v. Williams*, 193 Ill. 2d 306, 349 (2000).

¶ 59    In so holding, we also note that defendant's 6-year sentence falls near the minimum of the 4- to 15-year range he could have received. 720 ILCS 5/31A-1.1(i) (West 2010); 730 ILCS 5/5-4.5-30(a) (West 2010). The court found that the minimum sentence was not appropriate after reviewing defendant's criminal history, which included prior convictions for aggravated battery with a firearm and unlawful use of a weapon, and considering the goal of deterrence to others. As such, we cannot conclude that the sentence was based on improper considerations (*Conley*, 118 Ill. App. 3d at 133), or that it is clearly evident it was improperly imposed (*Ward*, 113 Ill. 2d at 526).

¶ 60    Finally, defendant maintains that various fines and fees were erroneously imposed. We review the propriety of a trial court's imposition of fines and fees *de novo. People v. Price*, 375 Ill. App. 3d 684, 697 (2007).

¶ 61    Defendant first contends that the $25 Court Services fee should not have been imposed because the fee only applies to certain enumerated offenses under section 5-1103 of the Counties Code (55 ILCS 5/5-1103 (West 2010)), and possession of contraband in a penal institution is not one of those enumerated offenses. This court, however, has previously considered and rejected this argument, finding that defendant's proposed interpretation "is inconsistent with the legislature's clear intent, expressed in the plain language of the statute, in enacting such a fee." *People v. Adair*, 406 Ill. App. 3d 133, 144 (2010). We find no reason

to depart from that holding here, and also conclude that the Court Services fee was authorized and properly assessed.

¶ 62    Defendant next maintains that the $2 Public Defender Records Automation fee, and the $2 State's Attorney Records Automation fee, are not "fees," but are "fines" which were assessed in violation of *ex post facto* principles.

¶ 63    The central characteristic that separates a fee from a fine is that a "fee" is intended to reimburse the state for a cost incurred in the defendant's prosecution, whereas a "fine" is punitive in nature, and is part of the punishment for a conviction. *People v. Jones*, 223 Ill. 2d 569, 582 (2006). In *People v. Rogers*, 2014 IL App (4th) 121088, ¶ 30, the Fourth District Appellate Court held that the State's Attorney Automation fee (55 ILCS 5/4-2002(a) (West 2012)), is a fee which is intended to reimburse the State's Attorneys for expenses related to automated record-keeping systems, and is not subject to the prohibition against *ex post facto* laws. *Rogers*, 2014 IL App (4th) 121088, ¶ 30 (" 'The prohibition against *ex post facto* laws applies only to laws that are punitive. It does not apply to fees, which are compensatory instead of punitive.' " (quoting *People v. Dalton*, 406 Ill. App. 3d 158, 163 (2010))).

¶ 64    Defendant, however, did not address the Fourth District's decision in *Rogers*, or provide any argument which would allow a finding that it is distinguishable, or was wrongly decided. We similarly conclude that the Public Defender Records Automation charge is a fee which is not subject to *ex post facto* principles.

¶ 65    Moreover, because the statutory language of both the Public Defender and State's Attorney Records Automation fees is identical except for the name of the organization, we find no reason to distinguish between the two statutes and conclude both charges constitute fees which were properly assessed. See 55 ILCS 5/3-4012, 4-2002.1(c) (West 2012).

¶ 66    Finally, defendant asserts, the State concedes, and we agree that he is entitled to a credit offsetting the $5 Drug Court fine and the $30 Children's Advocacy Center fine for the time he spent in presentence custody. Pursuant to section 110-14(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2012)), a defendant who is incarcerated on a bailable offense and who, upon conviction, is assessed a fine, is entitled to a $5 credit toward that fine for each day spent in presentence custody. Here, the record indicates that defendant spent 804 days in presentence custody, and is thus entitled to up to $4,020 in credit, to be applied toward applicable fines.

¶ 67    As both the $30 Children's Advocacy Center "fee," and the $5 Drug Court "fee," were not designed to reimburse the State for money it expended in prosecuting defendant in this case, they constitute fines for which defendant is entitled to credit pursuant to section 110-14(a) of the Code of Criminal Procedure. *People v. Williams*, 2011 IL App (1st) 091667-B, ¶ 19. Accordingly, defendant is entitled to $35 in presentence custody credit to offset those fines.

¶ 68    Pursuant to this court's authority to correct a mittimus without remand (*People v. Rivera*, 378 Ill. App. 3d 896, 900 (2008)), we direct the clerk of the circuit court to correct the fines and fees order to reflect that defendant's presentence custody credit satisfies his $30 Children's Advocacy Center fine, and his $5 Drug Court fine. We affirm the judgment of the circuit court of Cook County in all other respects.

¶ 69    Affirmed; fines and fees order corrected.