2020 IL App (1st) 163371-U

No. 1-16-3371

Order filed October 20, 2020

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 6729 |
| | ) | |
| DEWAN GASTON, | ) | Honorable |
| | ) | Frank Zelezinski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm defendant's conviction for first degree murder, concluding (1) the trial court did not err in permitting a State witness to testify as to her prior consistent identification of defendant; (2) the erroneous admission of a witness's testimony that she told "the same things" to the grand jury was harmless; and (3) the trial court did not improperly consider the victim's personal traits in imposing defendant's sentence.

¶ 2   Following a jury trial, defendant Dewan Gaston was convicted of first degree murder (720

ILCS 5/9-1(a) (West 2008)) and sentenced to 52 years' imprisonment, which included a 25-year

enhancement based on the jury's finding that he personally discharged the firearm that caused the victim's death. Defendant appeals, contending the trial court erred when it (1) permitted the State to elicit prior consistent statements from one of its witnesses; and (2) improperly considered the victim's personal traits in imposing defendant's sentence. We affirm.

¶ 3    The State charged defendant by indictment with, *inter alia*, two counts of first degree murder, alleging that, on December 6, 2008, he shot and killed Derrvelle Orr. The matter proceeded to a jury trial, at which the evidence established as follows.

¶ 4    On December 5, 2008, Orr, who was an aspiring musician, told his father, Derrick Orr, that he was going to a club to promote his music and asked to borrow Derrick's new Hummer. Later that evening, Orr met a friend, Tiffany Barnes, at Club Premier in Dolton.[1] Orr wore two or three pieces of expensive-looking jewelry. Barnes and Orr left Premier together at approximately 2:30 a.m. on December 6, 2008, and drove east on Sibley Boulevard in Orr's Hummer.

¶ 5    Orr pulled into a "well-lit" gas station on Sibley and parked at a gas pump facing south. He exited the vehicle and walked inside to pay. As he returned to the pump, a black car pulled into the gas station and parked on the opposite side of the pump, facing north. A black man with a "twistees" hairstyle, whom Barnes identified in open court as defendant, exited the black car, walked in front of the Hummer, and started talking with Orr. Orr reached into the Hummer for a CD or a promotional flyer and gave it to defendant, who peered into the Hummer, at which time Barnes saw his face from a distance of six feet.

---

[1] Throughout trial, the club was referred to as "Club Premier" and "the Premier Club." We will simply refer to it as Premier.

¶ 6    Barnes then heard a gunshot and saw Orr run in front of the Hummer and fall to the ground. As Orr was on the ground, she heard a second shot. Orr got up, ran into the street, and Barnes heard a third shot and saw Orr fall to the ground. Defendant got back into the car and it sped off toward the expressway. Barnes, who was panicked, called 911 and then ran to Orr who was lying unresponsive in the street with blood "pouring from his head."

¶ 7    As the shooting took place, Latavia Lacefield was driving east on Sibley and was stopped at the traffic light at its intersection with State Street when she heard multiple gunshots. She saw a man running from the gas station and then fall to the ground on State. The light turned green, and Lacefield drove through the intersection, at which time she saw a black or dark green Cadillac turn east out of the gas station onto Sibley and drive "faster than normal" on Sibley. Lacefield's passenger called 911 and gave the vehicle's description and license plate number to the operator.

¶ 8    Detective Michelle Malone, who was a patrol officer at the time of the shooting, and Officer Kramer responded to the scene and attempted unsuccessfully to administer aid to Orr.[2] Malone spoke with Barnes and Lacefield, who had returned to the gas station. Lacefield gave Malone the license plate number of the Cadillac she observed leaving the gas station. Malone "ran" the license plate number through the Law Enforcement Agencies Data System (LEADS) and learned the Cadillac was registered to "Dewan Gaston," whose address was in the 5800 block of South King Drive in Chicago.

¶ 9    Barnes and Lacefield were transported to the South Holland police department while Malone and Kramer remained at the scene to look for evidence. At the police station, Barnes viewed a photographic array and identified defendant as the shooter "within seconds."

---

[2] Officer Kramer's first name is not identified in the record.

¶ 10    Based on Lacefield's identification of defendant and his knowledge of whom the Cadillac was registered to, Detective Chris Lareau began working to identify family, friends, and associates of defendant. He went to King Drive in an attempt to locate defendant's vehicle but was unsuccessful. On December 9, 2008, the Cadillac was located at 47th Street and Ingleside in Chicago near defendant's brother's residence. After he exhausted his attempts to locate defendant in the Chicago area, he met with the State's Attorney's Office on January 8, 2009, and requested an arrest warrant "with full nationwide extradition for *** defendant." The warrant was issued and entered into LEADS. Lareau also disseminated a flyer in the Critical Reach System, an Illinois-specific database, which included defendant's photograph and indicated he had a warrant for his arrest.

¶ 11    The evidence also established that, after the shooting, defendant moved to Colorado, where he eventually met, began dating, and moved in with Amanda Bell. In February 2011, Bell and defendant were at their apartment, when police knocked on the door and inquired about the sale of marijuana which was allegedly taking place out of the apartment. The police left after determining the person for whom they were looking was not present. Bell returned to the living room, where defendant was sitting, "acting kind of anxious and *** fidgety." Defendant told Bell that he had a warrant for his arrest in Chicago that was related to a murder. He told her he and his friends were out for his birthday, drinking and doing drugs, and stopped at a gas station, where he "got into it" with and shot another man. After the shooting, he and his friends drove to a relative's house in Chicago, and, shortly thereafter, defendant left for Colorado. Defendant directed Bell to tell police, if they talked to her, that his name was "DeAndre."

¶ 12 On February 23, 2011, Detective Erik Gulbrandson of the Colorado Springs police department went to defendant and Bell's apartment and made contact with Bell and defendant, whom he identified in open court. Gulbrandson asked defendant for identification, which defendant was unable to produce. Defendant told Gulbrandson his name was "DeAndre Gaston," and gave a false date of birth and social security number, which, when ran by dispatch, returned no record. Gulbrandson took defendant to an "operation center" so he could be identified. Defendant eventually told Gulbrandson he had not been truthful about his identity and provided his real name, date of birth, and social security number. Gulbrandson "ran" defendant's name and date of birth and confirmed he had an outstanding arrest warrant in South Holland relating to Orr's murder.

¶ 13 Defendant was extradited to the custody of the South Holland police department. He was placed into a physical lineup, which Barnes viewed and "immediate[ly]" identified him as the shooter.

¶ 14 A medical examiner performed an autopsy on Orr's body. The autopsy showed that Orr received a gunshot wound, which passed through his left arm and into his chest, piercing both lungs and causing internal bleeding. The medical examiner concluded that Orr's cause of death was this gunshot wound, and that his manner of death was homicide.

¶ 15 At trial, Barnes testified that she previously testified under oath before the grand jury. The following colloquy then occurred:

"Q. And during that time, you had an opportunity to be asked questions by a State's attorney?

[Defense counsel]: Judge, I am going to object to this line of questioning.

THE COURT: Objection overruled at this stage.

THE WITNESS: Yes.

\*\*\*

Q. Did you tell the ladies and gentlemen of the jury –

[Defense counsel]: Objection to what she told them.

THE COURT: Objection overruled.

\*\*\*

Q. Did you tell the ladies and gentlemen of the jury the same things in which you testified in open court today?

A. Yes.

[Defense counsel]: Objection.

THE COURT: Objection overruled."

¶ 16    Barnes was then shown a copy of the photographic array in which she identified defendant at the police station after the shooting, and the following colloquy occurred:

"Q. Is this the same photo array that you had previously identified the month prior?

A. Yes.

Q. And at the Grand Jury, did you also identify an individual in a photo array?

A. Yes.

[Defense counsel]: Objection.

THE COURT: Overruled.

\*\*\*

Q. And which individual did you identify?

A. [Defendant].

Q. Did you identify that individual as the person that was outside the gas pump right before the shots were fired to [Orr]?

A. Yes.

Q. Is that the same person that you identified in open court today?

A. Yes."

¶ 17    At the conclusion of Barnes's testimony, defendant moved for a mistrial, "based on the State's knowing direct examination of *** Barnes related to her [g]rand [j]ury testimony," arguing that it was an improper attempt to buttress or corroborate Barnes's testimony when it had not been contradicted or called into doubt. The court denied the motion.

¶ 18    The jury found defendant guilty of first degree murder and found he personally discharged the firearm that proximately caused Orr's death. Defendant filed a motion for new trial, in which he argued, in relevant part, that the court "erred in allowing the State to question Tiffany Barnes as to her identification testimony at the grand jury, as such constituted a prior consistent statement and was inadmissable [*sic*]." The trial court denied the motion.

¶ 19    At sentencing, the State presented three victim impact statements, two of which were presented through live testimony. The court also received a presentence investigation report (PSI), which showed defendant worked prior to his arrest, that he did not finish high school because he dropped out to support his daughter, and that he had no prior felony convictions and two misdemeanor convictions.

¶ 20    In aggravation, the State argued that Orr was only 20 years old when he was murdered, came from a good family, had a career in front of him, and "had no criminal record in reference to getting involved in gang violence." According to the State, Orr was out promoting his career, "dressing, living, and being the part," when defendant drove by the gas station and saw an opportunity. The State asserted that defendant set Orr up, waiting until Orr went into his car to get a promotional flyer to pull the gun and demand his belongings. The State then commented on the nature of the offense, stating that defendant continued to chase and shoot at Orr as Orr "ran for his life." The State observed that defendant evaded responsibility for the shooting for two years by moving to Colorado. The State argued the facts of the case did not warrant the minimum sentence, given "the way this brutal murder was committed," and noted Orr was not a gang member or drug dealer but was, in fact, "a victim in this case."

¶ 21    In mitigation, defense counsel noted that defendant left high school during his junior year so he could work to support his daughter who was born that year. Counsel explained that defendant was employed in various capacities throughout his early life. Counsel further noted that defendant had a good relationship with his daughter, who was now 13 years old. Defense counsel asserted defendant had no other felony convictions, had an otherwise insignificant criminal background, and stayed out of trouble while in jail awaiting trial on this case. Further, defense counsel argued defendant was not predisposed to violence based on his lack of criminal history and that this was an isolated incident in his life. Defense counsel contended the minimum sentence was an appropriate disposition.

¶ 22    Defendant waived his right to make a statement in allocution. In announcing defendant's sentence, the trial court merged the counts and noted that it had read the PSI, heard the victim

impact statements, and heard the arguments in aggravation and mitigation. The court noted "numerous factors" in mitigation supported defendant, including his lack criminal background, which indicated he had, "for the most part, *** lead [*sic*] a good life," and the fact that he had worked to support his daughter prior to this incident. With respect to aggravation, the court first noted that Orr "was a young man who was trying to do the right thing," and on the night of the murder was "doing what people should be doing, trying to earn themselves a future in life and working." The court noted that Orr, who was unarmed, was merely speaking with defendant "in a kindly manner," at which time defendant pulled a handgun and shot Orr. The court noted "[m]atters could have ended there" because Orr was disabled, began to run away, and posed no threat to defendant. However, defendant continued to shoot at Orr several times until Orr laid dead in the street. The court noted this was a "senseless killing in the metropolitan areas of our county."

¶ 23    The court closed its comments as follows:

> "The fact, number one, that it involved yet another handgun murder, and yet there's really
> no reason in any way for this to have happened. As such, [t]he [c]ourt has to fashion what's
> an appropriate sentence here based upon what is in aggravation and mitigation. In
> consideration of all matters in aggravation and mitigation here, knowing that the shooting
> occurred in a senseless manner, when it need not have done so, Defendant will be sentenced
> in this matter to serve 52 years in the Illinois Department of Corrections."

¶ 24    Defendant filed a motion to reconsider sentence, which the court denied.

¶ 25    On appeal, defendant first contends the trial court erred by permitting the State to bolster Barnes's trial testimony with her prior consistent testimony before the grand jury. Specifically, he argues it was error to permit, over his objection, Barnes to testify that she identified defendant as

the shooter before the grand jury and that she told the grand jury "the same things she testified to" at trial.

¶ 26    Before beginning our analysis of this issue, we note that defendant treats the two purported prior consistent statements as a single error and analyzes them together. However, we will address them separately because they are, in fact, two separate statements.

¶ 27    The decision to admit evidence is within the sound discretion of the trial court. *People v. Pikes*, 2013 IL 115171, ¶ 12. As a result, we review whether evidence was properly admitted for an abuse of discretion. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 33. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the position taken by the trial court. *Id.*

¶ 28    As a general rule, "a witness's prior consistent statements are inadmissible to corroborate the trial testimony of that witness because they serve to unfairly enhance the witness's credibility." *Id.* ¶ 34. There are two types of prior consistent statements: rehabilitative prior consistent statements and substantive prior consistent statements. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 99-100. Rehabilitative prior consistent statements are not admissible as substantive evidence. *Id.* ¶ 99. However, the rule barring the admission of prior consistent statements does not apply to statements of identification, which may be presented as substantive evidence as an exception to the hearsay rule. *Temple*, 2014 IL App (1st) 111653, ¶ 34. Section 115-12 of the Code of Criminal Procedure of 1963 (Code), titled "Substantive Admissibility of Prior Identification," states as follows:

    "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies

    at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the

statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2008).

¶ 29 Here, Barnes's testimony relating to her identification of defendant in a photo array during her grand jury testimony was plainly admissible as substantive evidence under this exception to the hearsay rule. Indeed, Barnes testified at trial, was subject to cross-examination, and her prior statement was one of identification made on January 6, 2009, before the grand jury, more than a month after perceiving defendant shoot Orr. Accordingly, we conclude the trial court did not abuse its discretion in overruling defendant's objection and admitting Barnes's testimony that she identified defendant in a photographic array before the grand jury. See *People v. Robinson*, 163 Ill. App. 3d 991, 995 (1987) (holding section 115-12 of the Code permits the admission of both prior out-of-court and in-court identifications of the accused as substantive evidence).

¶ 30 Defendant argues section 115-12 of the Code did not authorize the admission of Barnes' prior consistent statement. Defendant does not dispute Barnes's prior statement of identification fulfills the three statutory requirements of section 115-12, but, citing *People v. Dabbs*, 239 Ill. 2d 277, 288 (2010), asserts "the application of the statute affords a defendant 'all of the protections that otherwise exist in [the Illinois] [R]ules of [E]vidence,' such as those prohibiting the admission of prior consistent statements." According to defendant, the challenged testimony "went far beyond the admission of a prior consistent identification" where Barnes was permitted to testify that she told the grand jury "the same things" she told the trial jury.

¶ 31 We are not persuaded. First, as noted above, though defendant's argument groups together Barnes's testimony that she told the grand jury "the same things" she testified to at trial and her

testimony relating to her identification of defendant before the grand jury, the statements were separate and require separate analysis.

¶ 32     Second, *Dabbs* does not stand for the proposition that prior statements of identification are otherwise inadmissible under section 115-12 if they are consistent with a witness's trial testimony. Rather, that case held that section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2008)), which permits the admission of a defendant's prior acts of domestic violence in a prosecution for certain domestic-violence offenses, is subject to the rules of evidence prohibiting the admission of irrelevant evidence and requiring the trial court to balance the probative value and prejudicial effect of the evidence. *Id.* at 291.

¶ 33     Third, defendant's interpretation of *Dabbs* as it relates to section 115-12 of the Code, *i.e.*, that a prior statement of identification is subject to the bar against the use of prior consistent statements, leads to the untenable conclusion that a prior consistent statement of identification is never admissible as substantive evidence. Such an interpretation runs contrary to the legislature's intent in enacting section 115-12. See *People v. Lewis*, 165 Ill. 2d 305, 343 (1995) (Section 115-12 was "designed to permit the use of prior *consistent* out-of-court statements as corroborative or substantive evidence of a witness'[s] prior identity of a defendant." (Emphasis in original.)).

¶ 34     With respect to the second prior consistent statement—that Barnes told the grand jury "the same things" she told the jury at trial—the State concedes the court erred in admitting this prior consistent statement. We accept the State's concession. See *People v. Henderson*, 142 Ill. 2d 258, 309-10 (1990), *not followed on other grounds by People v. Terry*, 183 Ill. 2d 298, 304-05 (1998). The State nevertheless argues its admission was harmless. We agree.

¶ 35    If an evidentiary error is harmless, the error does not require reversal. *People v. Ramos*, 2018 IL App (1st) 151888, ¶ 24. An evidentiary error is harmless "where there is no *reasonable probability* that the jury would have acquitted the defendant absent the error." (Emphasis in original; internal quotation marks omitted.) *Stull*, 2014 IL App (4th) 120704, ¶ 104.

¶ 36    Initially, we note that a general prior consistent statement—like Barnes's statement that she told the jury "the same things" she previously told the grand jury—is less prejudicial than a specific consistent statement, especially since no part of Barnes's grand jury testimony was read to the jury and where she corroborated only herself. See *Henderson*, 142 Ill. 2d at 311-12; see also *Stull*, 2014 IL App (4th) 120704, ¶ 105. Further, the State's evidence overwhelmingly established defendant's guilt even despite the lack of physical evidence tying defendant to Orr's murder. In addition to Barnes's eyewitness account of the shooting, the State also presented evidence that a passerby, Lacefield, heard gunshots and observed a black Cadillac, which was later determined to be registered to defendant and found at his brother's house, turn out of the gas station and drive away at a high rate of speed. The State also presented evidence that, after the offense, defendant fled to Colorado, admitted to Bell that he shot and killed a man in the Chicago area, gave false identifying information to Gulbrandson, and otherwise attempted to avoid identification. Given this evidence, we find there is no reasonable probability the jury would have acquitted defendant had Barnes's testimony that she previously told the grand jury "the same things" she told the jury at trial been excluded. Accordingly, we conclude the error was harmless.

¶ 37    Finally, defendant contends he is entitled to a new sentencing hearing because the trial court improperly considered the personal characteristics of Orr in aggravation at sentencing. He argues the error is apparent where the State argued defendant should receive a higher sentence

because of Orr's good character and where the trial court specifically noted these facts were aggravating factors.

¶ 38    Although sentencing decisions are generally matters of judicial discretion, the question of whether a court relied on an improper factor in imposing a sentence is a question of law that we review *de novo*. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49. When raising such a challenge, the defendant must affirmatively establish that the sentence was based on an improper consideration. *Id.* We will reverse a sentence imposed by a trial court only where it is clearly evident the sentence was improperly imposed. *Id.*

¶ 39    When reviewing a claim that the court relied on an improper sentencing factor, we do not focus on isolated statements but rather evaluate the record as a whole. *Id.* ¶ 50. Victim-impact evidence is admissible at sentencing (725 ILCS 120/6 (West 2008)), and although the court may rely on such evidence to the extent it pertains to the specific harm caused by the defendant's acts, it may not rely on the victim's personal traits, status, or community standing as demonstrating " 'defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy.' " *People v. Mauricio*, 2014 IL App (2d) 121340, ¶ 19 (quoting *Payne v. Tennessee*, 501 U.S. 808, 823 (1991)). However, "[t]o the extent that a victim's personal traits are necessary to understand the seriousness of the crime or other proper sentencing factors, consideration of such traits is not inherently error." *Mauricio*, 2014 IL App (2d) 121340, ¶ 17.

¶ 40    Defendant acknowledges he forfeited review of this issue as a result of his failure to raise a contemporaneous objection and include the issue in his motion to reconsider sentence. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010) (to preserve a claim of sentencing error, the defendant

must raise a contemporaneous objection and include the purported error in his written postsentencing motion). Defendant nevertheless argues we may review the issue under the plain error rule. "In the sentencing context, a defendant must *** show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.* However, to obtain relief under the plain error rule, the defendant must first establish that a clear or obvious error occurred. *Id.*

¶ 41   After reviewing the record as a whole and considering the trial court's comments at sentencing in context, we conclude the court did not improperly consider the victim's personal traits in imposing defendant's 52-year sentence. While the trial court noted the fact Orr was a "young man trying to do the right thing" by promoting his career was a matter in aggravation presented by the State, the record reflects this comment was made in relation to the nature and circumstances of the crime, which is a proper sentencing factor. See *People v. Himber*, 2020 IL App (1st) 162182, ¶ 59. The court noted that, on the night of the murder, Orr was out "doing what people should be doing, trying to earn themselves a future in life and working." The court's remaining comments, however, reveal that it relied on these facts only to emphasize this was a "senseless murder" committed without provocation. Indeed, after making these comments, the court shifted its focus to the nature and circumstances of the crime—noting it was unprovoked, need not have happened, and most importantly, that defendant continued to shoot Orr once he was disabled and tried to flee—and did not return to Orr's personal traits throughout the remainder of its discussion. The court's focus on the nature and circumstances of the crime is made evident by its comments just before imposing defendant's sentence, wherein it reiterated this was a "senseless murder." As noted above, it is not improper to consider the personal traits of the victim insofar as

it relates to the nature and circumstances of the crime. See *Mauricio*, 2014 IL App (2d) 121340, ¶ 17; *Himber*, 2020 IL App (1st) 162182, ¶ 59. Accordingly, we find the court did not improperly consider Orr's personal traits in imposing defendant's 52-year sentence.

¶ 42     In reaching this conclusion, we find *Mauricio*, relied on by defendant, is distinguishable. In that case, the defendant, who pleaded guilty, challenged his sentence on appeal from a remand for compliance with Rule 604(d). At the original sentencing hearing, the court focused on the victim's personal traits and status and, just before imposing the defendant's sentence, again noted the victim was a "very, very fine man." *Mauricio*, 2014 IL App (2d) 121340, ¶ 21. The court again referenced those traits spontaneously in denying defendant's motion to reconsider sentence. *Id.* Moreover, the court failed to distance itself from this improper factor on remand despite the fact the State indirectly encouraged it to do so. *Id.* The appellate court concluded that, if the trial court would have given the same sentence without considering the victim's personal traits, it would have expressly reflected that at the hearing on defendant's motion to reconsider or at the hearing on remand. *Id.* Thus, the appellate court found it could not determine from the record that the weight placed on the improper aggravating factor was so insignificant that it did not lead to a greater sentence. *Id.*

¶ 43     As discussed above, the record in this case shows the trial court merely referenced Orr's personal traits in relation to its discussion of the senseless manner of the killing. Indeed, the court noted Orr did nothing wrong on the night of the murder to provoke defendant; rather, he was out "doing what people should be doing," when defendant found and targeted him. Unlike *Mauricio*, the court did not focus on the victim's personal traits or status in the community. Further, unlike the court's comments in this case, the *Mauricio* sentencing court's focus on the victim's personal

traits were made apparent by its spontaneous recall of those traits at the hearing on the motion to reconsider sentence and when it failed to distance itself from those comments on remand.

¶ 44    In sum, we conclude the trial court properly admitted Barnes's prior consistent statement of identification during her direct examination, the erroneous admission of Barnes's testimony that she testified at trial "to the same things" she told the grand jury was harmless, and the trial court did not improperly consider Orr's personal traits in determining defendant's sentence.

¶ 45    For the reasons stated, we affirm the trial court's judgment.

¶ 46    Affirmed.