2020 IL App (1st) 170583-U

SIXTH DIVISION
December 18, 2020

No. 1-17-0583

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 1973 |
| | ) | |
| TYREESE RICHARDSON, | ) | Honorable |
| | ) | Erica L. Reddick, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Connors and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's convictions for home invasion and aggravated criminal sexual assault are affirmed. Defendant has not shown that the trial court improperly considered a factor inherent in the offenses as an aggravating factor at sentencing.

¶ 2   Following a bench trial, defendant Tyreese Richardson was found guilty of multiple counts of home invasion, aggravated criminal sexual assault, and residential burglary. The trial court merged the counts into one count of home invasion predicated on using or threatening force while armed with a dangerous weapon (720 ILCS 5/12-11(a)(1) (West 2010)), and two counts of aggravated criminal sexual assault predicated on Mr. Richardson using, displaying, or threatening to use a dangerous weapon (720 ILCS 5/11-1.30(a)(1) (West Supp. 2011)). The court sentenced

Mr. Richardson to a total of 50 years in prison. Mr. Richardson argues on appeal that, in imposing sentence, the court plainly erred by considering in aggravation a factor inherent in his offenses, specifically, that his conduct caused or threatened serious harm. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4      Mr. Richardson was charged by indictment with six counts of home invasion, eight counts of aggravated criminal sexual assault, and three counts of residential burglary.

¶ 5      At trial, A.D. testified that, on August 25, 2012, she was at the home of her boyfriend, Dominick A., on the 2700 block of West Gladys Avenue, in Chicago. A.D. and Dominick spent the previous night sleeping in his bedroom on the first floor. At around 6 a.m., A.D. awoke when Dominick got out of bed, put a fan in the window, and left the room. A.D. went back to sleep. When she woke again, she saw a man in the corner by the window. A.D. assumed it was her boyfriend, but she was not fully awake yet. A.D. asked what he was doing, and the man did not respond.

¶ 6      The man then "pounced" on A.D.'s back and pushed her head towards the mattress. A.D. tried to fight him off. At that point, A.D. still assumed the man was her boyfriend and asked what he was doing. When the man responded, "shut up," A.D. realized it was not Dominick's voice and continued fighting. A.D. repeatedly tried to raise her head off the mattress and stand, but the man forced her down.

¶ 7      The man lowered A.D.'s pants "[h]alfway down [her] bottom," and asked A.D. who else was there. She responded that she did not know. The man wrapped a blanket around A.D.'s head, pushed her head to the mattress, and tied her hands behind her back with a cord. He pulled her pants down farther and alternately forced his penis into her vagina and anus two separate times each, disregarding when she told him to stop and that she was wearing a tampon. When the man

stopped penetrating A.D., she felt a liquid on the right side of her back, which the man wiped off with what felt like a soft cloth. Afterwards, A.D. felt a cold, sharp, metal object across her back. A.D. testified that her boyfriend kept a knife in the bedroom for protection and the object felt like a sharp knife. A.D. did not say anything when she felt the object because she was afraid the man would use the knife against her.

¶ 8    A.D. then heard Dominick trying to open the door to the bedroom and say, "open the door." A.D. did not do anything because she was afraid. In a feminine voice, the man said something to the effect of, "I'm just changing." Dominick continued trying to open the door and the man responded again in a feminine voice, "hold on, we're just f***." The door opened abruptly, and A.D. heard "a lot of sounds." When she was able to get up, she saw Dominick "swinging at a man," and "saw the man go out the window." The window had been closed when A.D. went to bed, but was now open, allowing daylight into the room. The sunlight allowed A.D. to clearly see the man, whom A.D. identified in court as Mr. Richardson.

¶ 9    After Mr. Richardson fled, A.D. noticed a hat inside the room that did not belong to Dominick. Dominick followed Mr. Richardson out the window. When he returned, they called the police. An ambulance took them to the hospital, where biological evidence was collected. Several days later, A.D. was shown a photograph lineup but did not identify anyone. However, in January 2013, she identified Mr. Richardson at an in-person lineup.

¶ 10    Dominick testified that he was on probation for felony theft on the date of his testimony. He woke early on August 25, 2012; it was hot, so he opened the window and placed a fan in it, left the bedroom to get water and go to the bathroom, and left the door to the bedroom ajar. A.D. was asleep on the bed and no one else was in the room.

¶ 11    When Dominick returned to the bedroom 5 to 10 minutes later, the door was closed. He

called to A.D. and heard a male voice respond "Boo, we just f\*\*\*." He could tell it was not A.D.'s voice. He had to "bust" the door in because something had been placed behind it. Once he opened the door, he saw A.D. and a person he identified in court as Mr. Richardson. He did not know Mr. Richardson and had not given Mr. Richardson permission to be there. Mr. Richardson was jumping out of the window, feet first, but Dominick was able to punch him in the face. Mr. Richardson was wearing a hat at one point, which Dominick saw in the bedroom later. He started to pursue Mr. Richardson out of the window but returned to ask A.D. what happened.

¶ 12    The State showed Dominick the photograph of the knife recovered outside, and Dominick said that he had that knife in his room the night before the attack. Following the incident, the box for his headphones was empty and the headphones were never recovered. He did not identify anyone when shown a photo array on August 30, 2012, but when he viewed an in-person lineup in January 2013, he identified Mr. Richardson as the person he saw in his bedroom.

¶ 13    Imani J., Dominick's sister, testified that she lived on the first floor of the home on August 25, 2012. She spent the previous night sleeping in the living room. She awoke in the early morning to a knock on the "back window." She checked the window, did not see anything, and went back to sleep. She awoke again to see Dominick in the living room, pushing on the door to his bedroom. It took him several pushes to open the door, which swings inward. When the door opened, Imani saw A.D. on the bed crying and untying a white cord that was around her arms, and Dominick "going towards someone out the window." Imani only saw the man's back and could not tell his race. The State showed Imani a photograph of a knife, and she stated that it was a knife from their home.

¶ 14    Detective Jeffrey Hansson identified a photograph of the home showing an open first floor window, a box fan on the ground, and an evidence marker where a kitchen knife was found.

Detective Hansson testified that the open window led to Dominick's bedroom and the knife in the State's photograph exhibit was the knife recovered on the ground.

¶ 15    The State also presented testimony from the nurse and doctor who performed a sexual assault kit on A.D. at the hospital. The nurse said that she preserved in the kit swabs taken from A.D.'s mouth, vagina, anus, right breast, and right torso, and a standard of her blood, and gave the kit to a police officer. The doctor testified that A.D. had a scratch on her right back, two abrasions to her labia, and blood inside her vagina, but he could not determine the source of the blood and A.D. told him she was menstruating. A forensic scientist for the Illinois State Police testified that the swabs from her vagina and anus contained semen, and preserved them for DNA analysis, along with the other swabs from A.D., a standard of A.D.'s blood, a swab from the handle of the knife, a swab and cutting from the inside of the hat, and a buccal swab from A.D.'s boyfriend.

¶ 16    Another forensic scientist, Lynette Wilson, testified that she performed a DNA analysis. The knife contained a DNA profile from which Mr. Richardson could not be excluded, and the hat and swabs from A.D.'s vagina and anus contained a DNA profile that matched Mr. Richardson's.

¶ 17    Detective Joan Burke testified that she and her partner showed A.D. a photo array on August 30, 2012, and A.D. "identified someone that she felt looked the closest to the person who sexually assaulted her" but could not definitively identify anyone. The person A.D. selected as "closest" to the person that attacked her was Mr. Richardson.

¶ 18    Detective Susan Ruck testified that she and a partner met with Mr. Richardson in January 2013, after receiving a DNA report from the Illinois State Police. After being advised of his rights, Mr. Richardson told them that he was walking near the 2700 block of West Gladys in the early morning of August 25, 2012, saw an open window on the side of the building, and crawled through it. He did so in the early morning because "if he did go into a building in those hours and if someone

was home, they would normally be sleeping so that he could enter that way." Mr. Richardson looked in the bedroom for something to steal. As he examined a box of headphones, a girl started to get up from the bed. Mr. Richardson said that "something came over him, and he pushed the girl back down on the bed and *** forced himself on her." He "said that he held her arms down, *** pushed her head into the mattress and then put his penis in her vagina while he was behind her." Mr. Richardson did not know whether he penetrated her anus. He jumped out the window when he heard someone else come into the room and his hat fell off. Mr. Richardson stole the headphones from the box. Mr. Richardson later repeated the statement he gave Detective Ruck to an assistant State's Attorney. Detective Ruck administered the in-person lineup to A.D., who identified Mr. Richardson as her attacker.

¶ 19    As a proof of other crimes witness, A.W.H. testified that, at around 6 a.m. on August 5, 2012, she was sleeping alone in her home when a man pulled on her arm and asked where she kept her money. A.W.H. fought with the man, who had a knife from A.W.H.'s kitchen. The man tied her hands and feet behind her. A.W.H. fell face down on the floor and the man penetrated her vagina with his penis and threatened to kill her if she looked at him. The man had something covering his face. The man then penetrated her anus with his penis. The man moved A.W.H. back onto the bed, "put a pillow or sheet or comforter on top of [her] head and held it down," and penetrated her vagina and anus again. They moved back to the floor and the man continued to penetrate her. Afterwards, the man rummaged through the drawers in A.W.H.'s bedroom and bathroom. He took A.W.H.'s wedding and engagement ring off her finger and threatened to kill her. The man left and A.W.H. called the police.

¶ 20    A nurse testified that she and a doctor performed a sexual assault kit on A.W.H. at the hospital. Evidence technicians testified that they took a buccal DNA swab from A.W.H. and her

husband, recovered A.W.H.'s clothing, and collected the sexual assault kit. A forensic scientist determined that semen was present in swabs from A.W.H.'s vagina and anus and on her nightgown, all of which she preserved for DNA analysis. Ms. Wilson testified that Mr. Richardson could not be excluded from contributing to the DNA profile of the semen found on A.W.H.'s nightgown. On cross-examination, Ms. Wilson stated that she did not find an association between Mr. Richardson and the anal and vaginal swabs, but, on redirect examination, she testified that a swab taken from the back of A.W.H.'s thigh contained a DNA profile from which Mr. Richardson could not be excluded. Detective Burke testified that she interviewed Mr. Richardson regarding A.W.H.'s assault and Mr. Richardson admitted entering A.W.H.'s home through a window intending to steal things, took a knife from A.W.H.'s kitchen and, when he saw A.W.H. sleeping upstairs, penetrated her vagina with his penis and took her wedding ring.

¶ 21    The trial court found Mr. Richardson guilty on all counts of home invasion and aggravated criminal sexual assault, and two residential burglary counts. Mr. Richardson's motion for a new trial was denied.

¶ 22    At a presentencing hearing, the parties reviewed and corrected Mr. Richardson's presentence investigation (PSI) report. The PSI report is not included in the record on appeal.

¶ 23    At the sentencing hearing, the State read A.D.'s victim impact statement. A.D. wrote that she suffered "[t]remendous pain" in her neck and back from wrestling with Mr. Richardson and having her head shoved towards the bed. During the attack, Mr. Richardson "suffocated" her and she feared she would die. The hopelessness she felt caused her to "break down," experience depression and self-hatred, and lose the will "to do anything, including school." A.D. and her boyfriend both endured "emotional pain," and A.D. lived with the pain of Mr. Richardson's "decisions" every day.

¶ 24    In aggravation, the State noted Mr. Richardson's "audacity" in breaking into the bedroom, "barricading" himself in with A.D., and "seizing an opportunity" to sexually assault her. The State argued that Mr. Richardson physically harmed A.D., showed he was a violent person by running the knife down her back, and deprived A.D. of a sense of safety in her boyfriend's home.

¶ 25    The State reviewed Mr. Richardson's criminal history, noting that he was 20 years old at the time of the offense and had adult felony convictions for residential burglary and possession of a controlled substance. He also had two juvenile adjudications for possession of a stolen motor vehicle, and adjudications for delivery of a controlled substance and possession of a controlled substance. According to the State, Mr. Richardson's criminal history, along with the other crimes evidence presented at trial, showed he was likely to reoffend and unlikely to rehabilitate, and that a "substantial" prison term was necessary to deter similar crimes.

¶ 26    In mitigation, defense counsel noted that Mr. Richardson had been diagnosed with psychiatric problems, suffered from depression, and told the presentence investigator that he attempted suicide while incarcerated. Mr. Richardson's mother informed counsel, who reported their conversation to the court, that, when Mr. Richardson was a child, she was in an abusive relationship with his father that caused them to move often. When Mr. Richardson was around 6 years old, she discovered him naked with a naked 12- or 13-year-old girl on top of him. Mr. Richardson's mother believed he dropped out of school around the seventh grade. Mr. Richardson began smoking marijuana daily around the age of 11 or 12 and took ecstasy pills approximately twice a week. Defense counsel requested the minimum 38-year sentence, arguing that it was already substantial.

¶ 27    In allocution, Mr. Richardson stated that he got involved with drugs at a young age in order to help his family, had never been a violent person, and was innocent.

¶ 28    The trial court took a recess and then came back to pronounce the sentence. The court noted that there were statutory factors both in aggravation and mitigation and then said:

> "The Court looks additionally to the factors in aggravation and of the several now in existence, I think those that stand out as ones applicable in this case in particular are the first listed. That the defendant's conduct caused or threatened serious harm. The third, that the defendant has a history of prior delinquency or criminal activity. Seven, that the defendant is or that a sentence is necessary to deter others from committing the same crime."

¶ 29    The court continued that it considered the evidence at trial, the PSI, Mr. Richardson's history, character, and attitude, the parties' arguments in aggravation and mitigation, and the cost of incarceration. The court also considered Mr. Richardson's statement in allocution, A.D.'s victim impact statement, the "utter seriousness" of the offenses, and the need to restore Mr. Richardson to useful citizenship. The court asked:

> "How does the Court quantify the harm exacted against the complaining witness in this case considering her very poignant words as part of her impact statement as to how this incident, these decisions as she referred to them of Mr. Richardson, how they have impacted not only her life but the lives of other members of the household that was violated on the date of this incident."

¶ 30    The court merged the counts for home invasion and residential burglary into a single count of home invasion predicated on Mr. Richardson using or threatening force while armed with a dangerous weapon (720 ILCS 5/12-11(a)(1) (West 2010)) and sentenced Mr. Richardson to 10 years' imprisonment on that count. The court merged the aggravated criminal sexual assault counts into two separate counts for penetrating A.D.'s vagina and anus, respectively, while displaying,

using, or threatening to use a dangerous weapon (720 ILCS 5/11-1.30(a)(1) (West Supp. 2011)), and on each count sentenced Mr. Richardson to 10 years' imprisonment plus mandatory 10-year weapon enhancements. Each sentence was imposed consecutively, for a total of 50 years' imprisonment.

¶ 31    Defense counsel filed a motion to reconsider the sentence, arguing that the sentences were excessive and the court improperly considered the proof of other crimes evidence. The court denied the motion, reiterating that its decision reflected the evidence at trial and the need to protect the public given the seriousness of Mr. Richardson's conduct.

¶ 32                                    II. JURISDICTION

¶ 33    Mr. Richardson was sentenced on February 17, 2017, and timely filed his notice of appeal that same day. We have jurisdiction pursuant to article VI, section 6 of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments of conviction in criminal cases.

¶ 34                                    III. ANALYSIS

¶ 35    On appeal, Mr. Richardson argues that the trial court improperly considered whether his conduct caused or threatened serious harm in aggravation at sentencing where that factor was inherent in the offenses for which he was found guilty.

¶ 36    Specifically, Mr. Richardson argues that he was found guilty of aggravated criminal sexual assault, which required a finding that he committed the offense while threatening to use a dangerous weapon, and found guilty of home invasion, which required a finding that he entered a residence to commit a burglary while threatening serious harm. Thus, he claims, it was improper for the court to consider the fact that he caused or threatened serious harm to A. D. as an aggravating factor in sentencing.

¶ 37    Mr. Richardson acknowledges that he did not preserve this claim for appeal by lodging a contemporaneous objection or raising it in his motion to reconsider sentence. See *People v. McGuire*, 2016 IL App (1st) 133410, ¶ 12 (errors forfeited if not brought to trial court's attention via contemporaneous objection or motion to reconsider). He asks that we review the issue under the plain-error doctrine, which allows a reviewing court to consider unpreserved errors when a clear or obvious error occurred and (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant," or (2) "the error is so serious that it affected the fairness of the defendant's trial and the integrity of the judicial process." *People v. Jones*, 2016 IL 119391, ¶ 10. The defendant bears the burden of showing plain error. *Id.* The reviewing court's first consideration is whether an error occurred. *Id.* Because this court finds that no error occurred in sentencing, we need not consider Mr. Richardson's contention that such an error would be cognizable as plain error.

¶ 38    When determining whether a trial court considered an improper factor in imposing sentence, the reviewing court considers the record as a whole, rather than focusing on a few words or statements. *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). The defendant must affirmatively show that the sentence was based on an improper consideration. *Id.* Even if the court considers an improper factor, remand is unnecessary if the record reflects that the trial court placed insignificant weight on that factor. *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 13.

¶ 39    It is improper for the trial court to consider in aggravation a factor inherent in the defendant's offense. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 50. As our supreme court has made clear:

> "There is a general prohibition against the use of a single factor both as an element of a defendant's crime *and* as an aggravating factor justifying the imposition of a harsher

sentence than might otherwise have been imposed. [Citations.] Such dual use of a single factor is sometimes referred to as 'double enhancement.'" (Emphasis in original.) *People v. Gonzalez*, 151 Ill. 2d 79, 83–84 (1992).

¶ 40 However, a trial court may "consider the nature and circumstances of the offense, including the nature and extent of each element of the offense committed by the defendant [citations]." *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 50. Courts can also consider in aggravation the degree of harm caused by the defendant's conduct "*even in cases where serious bodily harm is arguably implicit in the offense for which a defendant is convicted.*" (Emphasis in original.) *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986).

¶ 41 It is clear that the trial court was considering the degree of harm Mr. Richardson caused when it stated that it sought to "quantify the harm" in view of A.D.'s victim impact statement, in which she described how Mr. Richardson's choices impacted her life and the lives other members of the household. The trial court's consideration of the degree to which the victim was harmed was not improper. See *Saldivar*, 113 Ill. 2d at 269; see also *People v. Hardeman*, 203 Ill. App. 3d 482, 491-92 (1990) (finding no improper consideration when the trial court noted the defendant committed aggravated criminal sexual assault at knifepoint, because "there are wide variances in the risk of harm to victims of sexual attacks").

¶ 42 Further, the court did not focus exclusively on harm to the victim. It considered the trial evidence which showed that Mr. Richardson broke into a bedroom, pushed A.D.'s head toward the mattress, lowered her pants, put a blanket around her head, tied her hands behind her back, forced his penis into her vagina and anus, and ran a knife down her back. It also considered the PSI report, which is not part of the record on appeal, testimony about Mr. Richardson's history and character, the court's own observations of his attitude, the parties' arguments in aggravation

and mitigation, the cost of incarceration, Mr. Richardson's statement in allocution, A.D.'s victim impact statement, and the "utter seriousness" of the offenses. In denying Mr. Richardson's motion for reconsideration, the court stated that its decision was based on the evidence at trial and the need to protect the public given the serious nature of Mr. Richardson's conduct. Viewing the whole of the trial court's statements, it is apparent that this harsh sentence was not improperly lengthened based on the fact that Mr. Richardson's conduct caused or threatened serious harm.

¶ 43    Mr. Richardson compares his case to *People v. Abdelhadi*, 2012 IL App (2d) 111053, and *Dowding*, 388 Ill. App. 3d 936. In *Abdelhadi*, the defendant pled guilty to aggravated arson predicated on causing great bodily harm, permanent disability, or disfigurement. *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 1; 720 ILCS 5/20-1.1(a) (West 2008). At sentencing, the trial court stated that it "considered that the conduct caused by the defendant did, in fact, endanger the lives of individuals." *Abdelhadi*, 2012 IL App (2d) 111053, ¶ 4. On review, we found that the trial court improperly relied on an implicit factor because the trial court did not discuss the degree or gravity of the defendant's conduct or merely mention the factor within the context of discussing the nature and circumstances of the defendant's offense. *Id.* ¶¶ 13-16. Similarly, in *Dowding*, the defendant pled guilty to aggravated driving while under the influence of a controlled substance predicated on becoming involved in an accident that resulted in the death of another person. *Dowding*, 388 Ill. App. 3d at 937; 625 ILCS 5/11-501(d)(1)(F) (West 2004). At sentencing, the court found in aggravation that the defendant "caused the greatest harm there could be, that is the death of another person." *Dowding*, 388 Ill. App. 3d at 941. The case was remanded because the trial court relied on an implicit factor. *Id.* at 944. The trial courts in those cases relied, without elaboration, on an element in the statutes of conviction, the endangerment and death of another, respectively, and then used those elements to impose harsher sentences.

¶ 44　　In contrast to *Abdelhadi* and *Dowding*, the court in this case elaborated extensively on how A.D. was harmed. As noted above, the degree of harm is different from the fact that the element of great bodily harm is satisfied. The court here never said or indicated that it was simply relying on the fact that A.D. was harmed or threatened with harm. That makes Mr. Richardson's case different than the cases that he relies on. See *People v. Morrow*, 2014 IL App (2d) 130718, ¶ 19 (distinguishing *Abdelhadi* and *Dowding* because the trial courts in those cases "specifically stated that [they were] considering an element of the offense in aggravation"). There was no double enhancement in this case and no showing that the trial court relied on an improper factor in sentencing Mr. Richardson.

¶ 45　　　　　　　　　　　　　　IV. CONCLUSION

¶ 46　　For these reasons, we affirm the judgment of the trial court.

¶ 47　　Affirmed.