2026 IL App (1st) 240185-U

No. 1-24-0185

February 9, 2026

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 14721 (02) |
| | ) | |
| DONYELL AUSTIN, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1   *Held:*  Defendant's sentence for attempted murder affirmed where the trial court did not consider any improper factors in aggravation in imposing sentence and trial counsel was not ineffective for failing to preserve his claimed sentencing error.

¶ 2   Following a jury trial, defendant Donyell Austin was convicted of attempted murder (720 ILCS 5/8-4(a), 5/9-1(a) (West 2018)) and robbery (720 ILCS 5/18-1(a) (West 2018)), and sentenced to 22 years in prison for attempted murder and a consecutive sentence of 3 years for robbery. On appeal, defendant challenges his sentence for attempted murder, arguing that the trial court considered improper factors in aggravation at sentencing, amounting to plain error.

Defendant also claims ineffective assistance of counsel because counsel failed to preserve his sentencing claim and ensure the court considered the strongest several factors in mitigation at sentencing. For the following reasons, we affirm.

¶ 3    On October 19, 2018, defendant and four codefendants were indicted on criminal counts related to an incident occurring on August 13, 2018. The codefendants pled guilty. The State proceeded to trial against defendant on counts of attempted murder of Leon Grant, aggravated battery of Grant and Calvin Lemons, and robbery of Lemons.

¶ 4    The evidence at trial showed that in the early morning of August 13, 2018, Lemons, Grant, Pamela Jackson, and Jessica Washington planned to buy cannabis near Independence Boulevard and Roosevelt Road in Chicago, Illinois. Grant drove Washington's vehicle to a location down the street from that area, while Washington sat in the front passenger seat, Jackson sat in the rear passenger side, and Lemons sat in the rear driver's side.

¶ 5    Washington testified that, when she exited the vehicle, a woman hit her in the face and a fight started. Approximately 15 to 20 men joined the fight, and Lemons and Jackson tried to break it up. The men jumped on Washington and Lemons. At one point during the fight, Washington heard Grant yelling, "he trying to take the truck." Washington returned to the vehicle, jumped in, found Lemons and Jackson, and called 911. Shortly thereafter, Washington found Grant by the side of a tree, nonresponsive, with blood running out of his nose and mouth.

¶ 6    Jackson testified similarly to Washington regarding the start of the fight. She estimated that over 50 people were present. Jackson added that, at the scene, she saw Grant on the ground and people "stomping" him. Grant looked unconscious and bloody, and he could not breathe.

¶ 7    Jackson and Washington both testified that they later learned that video of the fight had been posted live on Facebook. Jackson learned that the fight had been streamed, recorded, and posted on Facebook using "Facebook Live." An individual had sent her the video recording. She forwarded the video to police.

¶ 8    Washington received a video of the incident from her brother, who is now deceased. Her brother shared the video with her and their siblings. Washington immediately told the police about the video, which many people possessed.

¶ 9    Lemons testified that he exited the vehicle after the fight started. A group of 15 or more unidentified men approached him, punching and kicking him from every direction. Lemons was kicked on his head, stomach, and back. After the beating stopped, he stood up and looked for his friends. Another group of people again kicked and punched him, and he was "balled up" on the ground trying to protect his face. Someone took "everything" out of his pockets, including his phone, money, and lottery ticket. Lemons later found Washington, and together they found Grant propped against a tree, unconscious. Lemons initially observed Grant unconscious in the middle of the street, but the assailants went back and continued assaulting him, even though he was "out cold." Lemons went to the hospital for treatment of his injuries, which he described as bruises and contusions all over his head and body and an open wound on his foot.

¶ 10    Grant testified that he did not remember what happened during the incident and had memory issues since then. After the incident, he was in a coma and needed to learn again how to eat, talk, walk, and otherwise resume his life after regaining consciousness. At the time of trial, Grant used a walker and could not work or live independently.

¶ 11    The parties stipulated that Grant's primary care physician, Dr. Mark Kushner, was qualified to testify as an expert in the field of medicine with a specialty in general internal medicine. Dr. Kushner was not involved in Grant's initial post-injury care but conducted a clinical appointment on October 24, 2018. Dr. Kushner would have testified that, prior to the clinical appointment, he learned that Grant had been in a vegetative state with mechanical ventilation. At the appointment, Grant had a gastrotomy tube for nutrition. Grant's sustaining injuries were speech aphasia due to a traumatic brain injury. Dr. Kushner opined that Grant's injuries were consistent with punches and kicks to the head.

¶ 12    Chicago police detective Rocco Pruger testified as an expert on social media and its use in criminal investigations. Pruger stated that the Facebook Live option permits the account holder to stream live in real-time on their profile. Certain mobile devices allow an individual to record a video from Facebook Live and send the recording to other individuals. The recorded video can be trimmed down but not otherwise altered. Pruger identified People's exhibit No. 4 as an approximately five-minute mobile device screen-captured video of a Facebook Live video streamed from defendant's Facebook account.

¶ 13    The State published the recorded Facebook Live video of the incident, which the trial court admitted into evidence over defendant's foundation objection. The video is included in the record on appeal and has been viewed by this court.

¶ 14    The video shows a person, identified as defendant, briefly look directly into the camera, and then shows at least two people fist-fighting, while at least four people stand nearby. A nearby voice excitedly appears to say, "Oh it's going on," and "Get at it. Get at it. Get at it." Soon thereafter, more people join the fight, throwing punches at each other. The same voice excitedly

says, "It's going up. It's one of those. It's going up," and a female walking by says, "Yeah." The same voice lets out a loud whooping sound, and then says, "Beat his a***! Hold this, *** hold this ***, record that, record that!" Fingers are then visible on the screen briefly, and defendant is seen in view and running toward the fight.

¶ 15    The camera follows two men on the ground encircled by attackers, who are punching and kicking at them. A woman approaches but is punched to the ground, before a large black vehicle drives up to the scene. The woman who had been punched gets up and walks away. Meanwhile, the video focuses on a person wearing a blue shirt, identified as Lemons, who is attacked while attempting to walk away from the street and onto the grass. He is chased by a group of men and then punched to the ground and kicked repeatedly by about three people. Lemons attempts to curl up and protect himself, as he is held in place and hit on and around the head. After someone shouts repeatedly, "That's enough," the assailants walk away from Lemons.

¶ 16    The camera's view then returns to the street, where several assailants are kicking and punching a man, identified as Grant, while he attempts to curl up and protect his head. At one point during this attack, the camera's view changes to show another man looking directly into the camera and swearing is heard. The camera's view then reverts to show the ongoing attack. During the attack, defendant jumps and lands both feet onto Grant's head, and Grant goes limp. Someone repeatedly says, "That's enough," but several assailants continue to kick at and stomp Grant's head. A man drags Grant by his pants from the street onto the grass and props him against a tree. Assailants stomp and beat Grant's unconscious body propped against the tree for a brief portion of the video.

¶ 17   The camera's view then switches back to show defendant's face as he walks away from the scene, and he makes various statements while catching his breath, including: "We back on top," "Stop playing on us," "I fully beating his ass," and "It's more fun to help." Defendant continues speaking into the camera for almost a minute, additionally saying, among other things, "We'll be beating his ass all up and through here," and "You see how I jumped on his head?" The video continues for about another minute as defendant and other unidentified men appear to brag at and smile at the camera while walking away from the scene.

¶ 18   Chicago police detective James Schnier testified that after viewing a recording of the Facebook Live video, he attempted to access it on Facebook but, by August 14, 2018, the video was "already taken down." Schnier testified that defendant voluntarily surrendered himself for an interview, received his *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.E.2d 694 (1996)), and stated that the video was recorded using his Facebook account. Schnier arrested defendant, and four additional individuals were subsequently arrested. Based on Schnier's review of 911 records, defendant did not call 911.

¶ 19   The trial court instructed the jury on the theory of accountability, attempted first degree murder, aggravated battery, and robbery. The jury found defendant guilty of attempted murder and aggravated battery with great bodily harm of Grant, and aggravated battery on the public way and robbery of Lemons. The court denied defendant's motion for a new trial.

¶ 20   Defendant raised a posttrial claim for ineffective assistance of trial counsel, which the trial court found no basis for following a hearing. The case proceeded to sentencing.

¶ 21   According to the presentence investigation report ("PSI"), defendant described his childhood as "depressing." He lacked attention from his parents and at times did not have enough

food, clothing, and shelter. His mother's boyfriends physically abused him and her female friend sexually abused him. He ran away from home three times to escape the abuse. Defendant has seven siblings and, except for one, has a good relationship with them.

¶ 22     Defendant graduated high school, earned good grades, and volunteered at a safe haven. His biggest problem during high school was "hanging around the wrong people." Defendant denied any gang affiliation or membership.

¶ 23     The PSI disclosed that defendant had previously been found guilty of eight misdemeanors and four felonies, including aggravated assault of a peace officer, theft, and multiple cannabis related offenses. Defendant sold illegal drugs to support himself and his son, with whom he spent time every day.

¶ 24     Defendant lived in a violent neighborhood where drugs were easily available. He previously had a problem with alcohol, but no longer drank it since 2017. Drugs had caused problems in his life. Defendant was diagnosed with depression and PTSD and has anxiety attacks. He took medicine to help with his mental health issues.

¶ 25     According to the PSI, defendant explained that he did not have a good relationship with his codefendants in this case, who were "currently in society now." Defendant believed "he was targeted out of everyone on this case."

¶ 26     At sentencing, the State argued in aggravation that defendant had an extensive criminal history. The State read a victim impact statement prepared by Grant and his family, which described the loss of Grant's mental abilities and functions, and the impact of his losses on his family.

¶ 27    In mitigation, defense counsel argued that there was no evidence showing defendant's involvement in violent crimes before this incident. The case had been pending for five years, and defendant was 27 years old with a 6-year-old child. Counsel requested the minimum sentence based on defendant's background and facts of the case.

¶ 28    Defendant's girlfriend's mother spoke in mitigation and stated that defendant's son missed him. She believed defendant had time to think, pray, gain understanding, receive guidance, and learn that "he needs to do better to become a productive member of society."

¶ 29    In allocution, defendant thanked the court for "keeping [him] in custody to really open [his] eyes" and see that the individuals he had called his friends were not for him. Defendant wanted to show his little brother that there was more to life than going to jail and to do better for his child. Defendant asked for mercy and another chance "outside to do better."

¶ 30    Before announcing its sentence, the trial court stated:

"This case was a very, very disturbing case and it showed a degree of lawlessness and brazenness in the public. *** [T]he tapes that [defendant] made *** during the course of these events *** were horrific. And he was gleefully and joyfully bragging and encouraging people, celebrating the stomping on somebody's head, agitating the situation, getting people more excited perhaps than they already were. He appeared to me to be a ringleader of what was happening and he wanted the public to know everything that was going on, unabashedly.

[Defendant] *** always thought that somehow, for some unknown reason, I was singling him out differently than his codefendants. And it wasn't a case of singling out [defendant] but this is a case of recognizing that everybody has different degrees of culpability.*** [I]t's clear to me that he was the ringleader of the group and he was getting everybody so excited and encouraging the lawlessness and violence and out of control and celebrating it as he did that maybe it wouldn't have gone like that and been like that but for him. And that was something that was on him and his conduct as opposed to the others. *** [I] think he was the ringleader and made this much worse.

I thought that this case represents everything that's wrong with Chicago right now and urban living. *** The outright brazenness and lawlessness was very disturbing. I was fully prepared to consider a maximum sentence for [defendant] because I think he is a danger to

the community. I am noticing what his mom said, and she's a rational, reasonable woman. *** I'm seeing a much different tone from [defendant] today and a different way of addressing this situation than he has previously. I do find that mitigating, so, it's not going to be a maximum situation but it's still going to be significant."

¶ 31 The court merged the attempted murder and aggravated battery of Grant counts and sentenced defendant to 22 years in prison for attempted murder. The court merged the robbery and aggravated battery of Lemons counts and sentenced defendant to three years in prison for robbery, to be served consecutive to the attempted murder sentence. The court denied defendant's motion to reconsider his sentence, which asserted that his sentence was excessive and the court failed to consider statutory mitigation factors.

¶ 32 On appeal, defendant challenges his 22-year prison sentence for attempted murder, arguing that the trial court considered improper factors in aggravation and heavily weighed the improper factors in fashioning the sentence. He requests that we vacate his sentence and remand for a new sentencing hearing.

¶ 33 Defendant concedes that he has forfeited review of his claimed sentencing error, because he failed to raise it below. Defendant therefore requests plain error review or a finding that counsel provided ineffective assistance for failing to properly raise the issue below. *People v. Bush*, 2023 IL 128747, ¶ 71.

¶ 34 To preserve a claim of sentencing error, a defendant must make a contemporaneous objection and raise the claim in a written postsentencing motion. *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 24. This court may review unpreserved sentencing issues for plain error where a clear or obvious error occurred and "(i) the evidence at sentencing was closely balanced or (ii) the error was so egregious that it denied the defendant a fair sentencing hearing." *People v. Johnson*, 2024 IL 130191, ¶ 43.

¶ 35    Defendant bears the burden of persuading this court to excuse his forfeiture. See *id*. He requests review under the first prong of the plain error analysis, noting that our supreme court overruled the case law which previously would have permitted second-prong plain error review. See *id.* ¶ 92. The first step in a plain error analysis is to determine whether a clear or obvious error occurred. *Id.* ¶ 44. We therefore must first assess whether the trial court committed a clear or obvious error by considering an improper aggravating factor in fashioning its sentence.

¶ 36    In reviewing "a sentence for an alleged error based upon the consideration of an improper factor in aggravation, we consider the record as a whole and do not focus on a few words or statements." *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49. A sentence is "determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Relevant sentencing factors include the nature of the offense and the defendant's demeanor, moral character, habits, and age. *People v. Colone*, 2024 IL App (1st) 230520, ¶ 135. The seriousness of an offense is the single most important factor in crafting a sentence. *Hussain*, 2024 IL App (1st) 230471, ¶ 44.

¶ 37    This court affords great deference to the trial court's sentencing decisions and reviews such decisions under an abuse of discretion standard, because the trial court is in a better position to consider the statutory sentencing factors than this court. *People v. Clark*, 2024 IL 127838, ¶ 76. A sentence within the statutory range is presumed proper and "will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 56. However, the question of whether the trial court relied on an improper factor during sentencing presents a question of law which we review *de novo*. *People v. Streater*, 2023 IL App (1st) 220640, ¶ 73.

¶ 38    The sentencing range for attempted murder is between 6 and 30 years in prison. 720 ILCS 5/5-8-4(c)(1) (West 2022) (attempted first degree murder is a Class X felony); 730 ILCS 5/5-4.5-25(a) (West 2022) (Class X sentencing range). Here, defendant was sentenced to 22 years in prison, within the statutory range for attempted murder. We therefore presume his sentence is proper unless defendant affirmatively shows otherwise. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 12 (reviewing court presumes a sentence within range is proper).

¶ 39    Defendant asserts that the trial court considered improper factors in aggravation, leading to a harsher sentence. Defendant first argues that the trial court improperly categorized him as the "ringleader" of the group attack where no evidence supported that characterization. He asserts the only thing distinguishing him from his peers was that he "took out his phone and livestreamed" the altercation on Facebook. Defendant disputes that the evidence supported the trial court's conclusion that he initiated or directed the attack or permitted it to find him more culpable than his codefendants.

¶ 40    Here, the trial court's characterization of defendant as a "ringleader" focused on his conduct as observed in the recorded Facebook Live video, which the court accurately described as defendant "gleefully and joyfully bragging and encouraging people, *** agitating the situation," by "getting everybody so excited and encouraging the lawlessness and violence and out of control." The court found that, "maybe it wouldn't have gone like that *** but for [defendant]," and that "his conduct as opposed to others *** made [the situation] much worse." In context, the trial court sought to explain defendant's role and culpability in an attack perpetrated by multiple assailants, and to address defendant's contention that the court singled him out from his

codefendants. See *Bowen*, 2015 IL App (1st) 132046, ¶ 49 (we consider the entire record and not isolated words or statements in reviewing a claim of improper aggravating sentencing factor).

¶ 41 The trial court's characterization of the evidence as showing that defendant acted as a "ringleader" during the attack connotes the types of actions defendant undertook when he live-streamed the beating and exhorted the attackers repeatedly to beat the victim before joining in the attack himself. The evidence also showed that, while defendant was live-streaming, he handed his phone to someone else and directed the individual to "record it," and he was then recorded jumping on Grant's head with both feet. The trial court never stated that defendant initiated or controlled the violence. Defendant therefore has not shown that the trial court based its sentencing decision on a factor not in evidence and there is no error, plain or otherwise. *Johnson*, 2024 IL 130191, ¶ 43.

¶ 42 Defendant also contends the trial court's remarks that it "thought that this case represents everything that's wrong with Chicago right now and urban living" shows the court improperly imposed a sentence based on "some larger social issue or policy," and not his offense.

¶ 43 Reviewing the trial court's statements in context, we find that the court sentenced defendant on the particular circumstances of his offense. See *People v. Curtis*, 354 Ill. App. 3d 312, 326 (2004) (a reviewing court must not focus on isolated words or statements of the trial court to determine whether reversible error occurred). Rather than referring only to vague, societal ills, the court opined that the evidence showed "outright brazenness and lawlessness" and believed defendant was a danger to the community, where he not only egged on the attacking crowd but joined in the attack himself, jumping on the head of the defenseless Grant as he lay on the ground. See *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977) (the defendant's sentence "must be based upon

the particular circumstances of each individual case"). Throughout its sentencing decision, the court referenced defendant's conduct and the seriousness of the offense, which is a fundamental consideration of any lawful sentencing. *Hussain*, 2024 IL App (1st) 230471, ¶ 44. We find that the court fulfilled its obligation to impose an individualized sentence and articulated its individualized consideration of defendant and his conduct in this case. Defendant has therefore not met his burden to show a clear or obvious error. *Johnson*, 2024 IL 130191, ¶ 43.

¶ 44 In sum, the trial court did not consider improper factors in aggravation at sentencing. Defendant therefore has not shown a clear or obvious sentencing error, and we need not consider whether the evidence presented at sentencing was closely balanced under the first prong of the plain error analysis. See *People v. Hillier*, 237 Ill. 2d 539, 549 (2010) ("Defendant cannot meet his burden of persuasion on either prong of the plain-error rule because *** the face of the record shows no error, let alone a clear and obvious one."). We therefore must honor the procedural default of his claimed sentencing errors. *People v. McDonald*, 2024 IL App (1st) 232414, ¶ 29.

¶ 45 Defendant additionally contends that his trial counsel's failure to preserve his sentencing claim and direct the court's attention away from the improper aggravating factors to the strongest mitigating factors constitutes ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance "was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Accordingly, the existence of prejudice is a fundamental part of an ineffective assistance of counsel claim. *Strickland*, 466 U.S. at 687.

¶ 46    As stated, defendant failed to show that a clear or obvious error occurred in the trial court's sentencing. Therefore, defendant cannot demonstrate that he was prejudiced by counsel's failure to preserve his claim or show that, had counsel intervened to ensure that the court fully considered the mitigating evidence rather than the purported improper aggravating factors, his sentence would have been different. See *People v. Hanson*, 238 Ill. 2d 74, 115 (2010) (explaining that an ineffective assistance of counsel claim fails where the trial court did not err, as the failure to object cannot constitute deficient performance and cannot result in prejudice to the defendant). Because defendant cannot establish prejudice, his ineffective assistance of counsel claim fails. See *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 19.

¶ 47    For the foregoing reasons, we affirm the judgment of the Circuit Court of Cook County.

¶ 48    Affirmed.